To Whom It May Concern:

My name is Shuzhen Zhong, a citizen of the United States who took the Licensed Customs Broker Exam in April 2018 and landed a final score of 73.75 percent after appealing the exam twice. Due to the unprofessionalism and recklessness of the Executive Assistant Commissioner Brenda B. Smith who graded my exam and had my return appealed letter sent to a non-existed address and thus had my return appealed letter "MISSING" since May 23 2019. In the meantime, I kept calling U.S. Customs and Border Protection Broker Management Branch begging for return phone calls but no one ever returned my phone call. After I waited sufficient amount of time, I decided to reach out to the U.S. Customs and Border Protection again via Email to investigate where the second appeal letter went and I found out the letter was sent to an incorrect address as in <u>63 Quentin RD., 1st Floor Brooklyn, NY 11223</u> instead of my correct address <u>64 Quentin RD Brooklyn, NY 11223.</u>

I was devastated to find the fact that CBP Executive Assistant Commissioner Brenda B. Smith not only had my address wrong and she also had my gender wrong in the return appealed letter. My address went from <u>64 Quentin RD</u> to <u>63 Quentin RD</u>, my gender went from <u>MS. Zhong</u> to <u>MR. Zhong</u>. I honestly could not believe this is written from such a well-educated Executive Assistant Commissioner. Tons of questions popped in my head, "Did she proof read or double check anything she's grading?", "Did she graded my exam appeal while she's 100 percent fully present in her job?", "Did she graded my exam appeal as reckless as the way she wrote my return appealed letter?", "Did she overlook at my compelling argument in the appeal letter?". Why was she making mistakes/ errors here and there when she is grading such an important document? This exam appeal is my life, my career, how could she be doing her job so carelessly and unprofessionally. This exam appeal might just be a piece of paper she is grading, but it is everything that I have. I have to provide for the family, I have two kids to feed. I

have studied for this exam for a year and doing practice questions day and night. Do I deserve to be a victim of her unprofessionalism?

After trying to get help from the Broker Management Branch and the complaint department from the Customs and Boarder Protection. Their only response was SEEK ADDITIONAL REDRESS AT THE COURT OF INTERNATIONAL TRADE and left me hanging there feeling helpless and lack of justice. No one from the Customs and Boarder Protection is responsible for their misconduct, unprofessionalism, recklessness, carelessness. No one from the Customs and Boarder Protection tried to help me with contesting CBP exam appeal decision at the Court of International Trade to make everything right. I am on my own for everything, just me and my laptop.

I hope the Court of International Trade can step in and help me make everything right. To have a second look at my second appeal, to give me what I deserve. I am just 1.25 points (1 question) away from passing the Licensed Customs Broker Exam, please give me a chance.

If an attorney is needed for my case, please kindly provide me with a free attorney. If you have any questions regarding to the case, please do not hesitate to call me at 929-490-3100.

Sincerely,

*[signature]*

Shuzhen Zhong

1300 Pennsylvania Avenue NW
Washington, DC 20229



**U.S. Customs and Border Protection**

AUG 2 3 2018

Shuzhen Zhong
64 Quentin Rd. 1st FL.
Brooklyn, NY  11223

*1st appeal*

Dear Shuzhen Zhong:

Customs and Border Protection (CBP) has reviewed all examination questions from the April 25, 2018 Customs Broker License Examination, and has determined that all examinees should receive credit for questions 28, 66 and 68.  You have received credit for 28 and 68.

Your appeal of question 2, 31, 32, 51, 56 and 59 on the April 25, 2018 Customs Broker License Examination has been reviewed.  You did not receive credit for any questions that you appealed. Based on this determination, and including credit for any questions you may not have appealed but for which you were granted credit, your final score is 72.5 percent.  A score above 75 percent must be attained to achieve a passing score on the examination.

A review of the decision on the appeal may be requested by submitting arguments to the Assistant Commissioner, Office of Trade, within 60 days of the date of this letter.  Please note that only questions originally submitted for appeal are eligible for further review.

You may submit your request and documentation for further review to:

> U.S. Customs and Border Protection
> Assistant Commissioner
> Office of Trade
> 1400 L Street NW, 12th Floor
> Washington, D.C. 20229-1143
>
> Re: Customs Broker License Exam Appeals

If you have any questions regarding this matter, please do not hesitate to contact Ms. Julia Peterson, Chief, Broker Management Branch, at (202) 863-6601.

Sincerely,

*John P. Leonard*

John P. Leonard
Executive Director
Trade Policy & Programs Directorate
Office of Trade
Roberto Von Ziegler

1300 Pennsylvania Avenue NW
Washington, DC 20229



Shuzhen Zhong
63 Quentin Rd., 1st Floor
Brooklyn, NY 11223

MAY 2 3 2019

2nd appeal
Please pay close attention to address
Please refer to my 1st appeal address!

Dear Mr. Zhong:

Your second appeal request for review of questions 2, 31, 32, 51, 56 and 59 on the April 2018 Customs Broker License Examination has been received. Your arguments for questions 2, 31, 32, 51, 56 and 59 have been reviewed, and you received credit for question 2. Based on this determination, your final score is 73.75 percent. A score of 75 percent must be attained to achieve a passing score on the examination. The analyses for questions 31, 32, 51, 56 and 59 are enclosed.

If you have any questions regarding these results, please do not hesitate to email: brokermanagement@cbp.dhs.gov with "Second Appeal" in the subject line.

Sincerely,

Brenda B. Smith
Executive Assistant Commissioner
Office of Trade

Enclosure

**Question 31**
What is the **CLASSIFICATION** of a men's sweater vest constructed of 50% polyester, 50% cotton, knit fabric, the outer surface of which measures 8 stitches per 2 centimeters in the direction the stitches were formed?

A. 6110.20.2010
B. 6110.20.2030
C. 6110.30.3010
D. 6110.30.3030
E. 6211.33.9054

In grading the exam, CBP designated the correct answer as C. Subheading 6110.30.3010, HTSUS, provides for men's sweaters (including sweater vests), knitted or crocheted: of manmade fibers.

You state that answer A is more specific and that a men's sweater vest should be classified under the subheading 6110.20.2010, HTSUS, which specifically mentions cotton material (one of the two main fabrics of the men's sweater vest in question). You state that answer C does not specify cotton at all and is composed solely of manmade fibers, without specifying the kind of manmade fibers (such as polyester, acrylic, nylon, etc.). Therefore, you state that answer A is more aligned with the merchandise description.

The classification of goods under the HTSUS is governed by GRIs. GRI 1 provides that classification shall be determined according to the terms of the headings and any relative section or chapter notes. In the event that the goods cannot be classified solely based on GRI 1, and if the headings and legal notes do not otherwise require, the remaining GRIs may be applied.

Chapter 61, HTSUS, provides for "articles of apparel and clothing accessories, knitted or crocheted." Heading 6110, HTSUS, provides for sweaters, pullovers, sweatshirts, waistcoats (vests) and similar articles, knitted or crocheted. As the subject men's sweater vest is knitted, it is classifiable in heading 6110, HTSUS. The heading 6110, HTSUS, is broken down into subheadings based on textile composition.

The 2017 HTSUS provisions under consideration are as follows:

Sweaters, pullovers, sweatshirts, waistcoasts (vests) and similar articles, knitted or crocheted: Of cotton: 6110.20.20: Other . . . 6110.30: Of man-made fibers: 6110.30.30: Other . . .

Pursuant to the facts in Question 31, a men's sweater vest is constructed of 50% polyester and 50% cotton knit fabric. Therefore, classification is based on whether the merchandise is regarded as consisting wholly of cotton or of manmade fibers.

As a men's sweater vest is a product of heading 6110, HTSUS, Subheading Note 2 to Section XI, HTSUS, provides in pertinent part:

   (A) Products of chapters 56 to 63 containing two or more textile materials are to be

2

regarded as consisting wholly of that textile material which would be selected under note 2 to this section for the classification of a product of chapters 50 to 55 or of heading 5809 consisting of the same textile materials.

Note 2(A) to Section XI, HTSUS, states the following, in pertinent part:

> (A) Goods classifiable in chapters 50 to 55 or in heading 5809 or 5902 and of a mixture of two or more textile materials are to be classified as if consisting wholly of that one textile material which predominates by weight over each other single textile material.

When no one textile material predominates by weight, the goods are to be classified as if consisting wholly of that one textile material which is covered by the heading which occurs last in numerical order among those which equally merit consideration.

As previously mentioned, Question 31 deals with a men's sweater vest constructed of 50% polyester and 50% cotton knit fabric. In accordance with Subheading Note 2(A) and Note 2(A) to Section XI, HTSUS, when no one textile material predominates by weight, the garment is classifiable as if consisting wholly of that one textile material which is covered by the heading that occurs last in numerical order among those which equally merit consideration; therefore, the men's sweater vest in question is properly classified under subheading 6110.30.30, HTSUS, pursuant to GRI 1. Subheading 6110.30.30, HTSUS, provides for "Sweaters, pullovers, sweatshirts, waistcoats (vests) and similar articles, knitted or crocheted : Of man-made fibers: Other." At the statistical level, Statistical Note 3 to Chapter 61, HTSUS, states that statistical provisions for sweaters include garments, whether or not known as pullovers, vests, or cardigans, the outer surfaces of which are constructed essentially with 9 or fewer stitches per 2 centimeters measured in the direction the stitches were formed. Therefore, the subject men's sweater vest is classified under subheading 6110.30.3010, HTSUS, and the correct answer is C. Answer A is incorrect by the application of Subheading Note 2(A) and Note 2(A) to Section XI, HTSUS.

**Question 32**
What is the **CLASSIFICATION** of glazed ceramic mosaic cubes on a mesh backing, which measure approximately 1 centimeter wide by 1 centimeter long by 1 centimeter thick, and have a water absorption coefficient by weight of .3 percent?

   A. 6802.10.0000
   B. 6907.21.2000
   C. 6907.21.3000
   D. 6907.30.3000
   E. 6914.10.8000

In grading the exam, CBP designated the correct answer as D (6907.30.3000). Question 32 states that the merchandise consists of glazed ceramic mosaic cubes on a mesh backing, measuring 1 centimeter wide by 1 centimeter long by 1 centimeter thick, with a water absorption coefficient by weight of 0.3%. Pursuant to GRI 1, the mosaic cubes are classified in heading 6907, HTSUS, as "ceramic flags and paving, hearth or wall tiles; ceramic mosaic cubes and the like, whether or not on a backing; finishing ceramics." Subheading 6907.21, HTSUS, provides for "flags and paving, hearth or wall tiles, other than those of subheading 6907.30 and 6907.40: of a water absorption coefficient by weight not exceeding 0.5%." Subheading 6907.30, HTSUS, provides for "mosaic cubes and the like, other than those of subheading 6907.40." As the merchandise at issue consists of mosaic cubes, they are more specifically described in subheading 6907.30, HTSUS. In particular, they are classified in subheading 6907.30.3000, HTSUS, as mosaic cubes that are "glazed: the largest surface area of which is capable of being enclosed in a square the side of which is less than 7 cm: other: the largest surface area of which is less than 38.7 cm." Therefore, Answer D is the correct answer.

You state that Answer B is the correct answer for a similar reason, i.e., subheading 6907.30.3000, HTSUS (Answer D), omits the water absorption coefficient, unlike subheading 6907.21.2000, HTSUS (Answer B). However, it is necessary to compare the subheadings at the six digit level and skip to the eight digit level when looking at the water absorption coefficient identified in subheading 6907.21.20. At the six digit level, subheading 6907.30, more specifically describes the merchandise as ceramic mosaic cubes.

4

**Question 51**
Which of the following documents is an acceptable proof of export for drawback purposes?

       A. Notice of Intent to Export
       B. Certificate of Delivery
       C. Certificate of Manufacture and Delivery
       D. Bill of lading with laden on board date
       E. Waiver of Prior Notice of Intent to Export

In grading the exam, CBP designated the correct answer as D; a bill of lading showing when the cargo was laden on board a mode of transportation, which establishes fully the date and fact of exportation. This answer is taken directly from CBP regulations pertaining to drawback and exportation procedure s found at 19 C.F.R. § 191.72.

Section 313 of the Tariff Act of 1930 (the Tariff Act), as amended (19 U.S.C. § 1313), provides for drawback, providing sufficient evidence is provided linking an imported article to an exportation or destruction. Subpart G of Part 191 (19 C.F.R. §§ 191.71 - 191.76) discusses exportation and destruction procedures. Pursuant to 19 C.F.R. § 191.72, exportation of articles must be established with supporting documentary evidence that establishes fully the date and fact of exportation and the identity of the exporter. Specifically, the procedures for establishing exportation include, but are not limited to:

    (a) Documentary evidence of exportation (originals or copies) issued by the exporting carrier, such as a *bill of lading*, air waybill, freight waybill, Canadian Customs manifest, and/or cargo manifest;
    (b) Export summary (§ 191.73);
    (c) Official postal records (originals or copies) which evidence exportation by mail (§ 191.74);
    (d) Notice of lading for supplies on certain vessels or aircraft (§ 191.112); or
    (e) Notice of transfer for articles manufactured or produced in the U.S. which are transferred to a foreign trade zone (§ 191.183).
    19 C.F.R. § 191.72 (emphasis added).

You contend that there is no possible correct answer. However, you selected answer choice B, certificate of delivery. You state, section "19 C.F.R. § 171.72 [as listed on the official answer key posted after the exam] ... does not exist." You explain that 19 C.F.R. §191.1 0, is a more appropriate citation as it states "that a certificate of delivery issued with respect to the delivered merchandise or article documents the transfer of that merchandise or article and identifies such merchandise or articles as being that to which a potential right to drawback exists." You further state, "the certificate of delivery should definitely be an acceptable proof of export for drawback purpose."

Upon review, it is confirmed that answer D is a correct answer. First, bill of lading, answer choice D, is specifically listed as a document appropriate to prove exportation in 19 C.F.R.§ 191.72. Further, a bill of lading with the laden onboard date specifically includes the required information to fully establish the date and fact of exportation. Additionally, while

your argument that 19 C.F.R. § 171.72 does not exist is correct, it is irrelevant, as this reference was made in error, after the exam was conducted and would not affect the exam's outcome.

Further, examinees are permitted to have 19 C.F.R., the customs regulations, with them in the exam room. Part of the purpose of the examination is to test whether potential brokers can find and apply the correct regulation. However, Part 171 pertains to fines, penalties, and forfeitures of merchandise and is not relevant to drawback. The drawback regulations are currently contained in Part 191. Consequently, your argument that 19 C.F.R. § 191.10, is a "more appropriate citation" is unpersuasive, especially since 19 C.F.R. § 191.72 directly addresses the question. Nineteen C.F.R. § 191.10 pertains to certificates of delivery, which documents the transfer of imported merchandise to a third party; this document does not establish fully the date and fact of exportation. As you indicated, a certificate of delivery identifies merchandise which may represent a *potential* right to drawback; however, a successful claim for drawback is still dependent on the timely exportation or destruction of the transferred merchandise, pursuant to 19 U.S.C. § 1313. Accordingly, the appeal is denied.

**Question 56**
While examining your client's shipment of 1,000 handbags at the container examination station, CBP discovered that the goods bear a mark suspected of infringing a trademark associated with a well-known designer. The designer's mark is registered on the Principal Register of the U.S. Patent and Trademark Office and recorded with CBP. The suspect mark is not identical with or substantially indistinguishable from the registered and recorded mark; rather, CBP determines that it copies or simulates the registered and recorded mark and, consequently, detains the handbags.

Which of the following options is available to the importer to obtain relief from detention within 30 days?

  A. The importer may remove or obliterate the suspect marks from the handbags in such a manner that they are incapable of being reconstituted.
  B. The importer may label the merchandise with the following statement: "This product is not a product authorized by the United States trademark owner for importation and is physically and materially different from the authorized product."
  C. The importer may file a petition under 19 CFR pt. 171, persuasively arguing that the suspect marks do not actually so resemble the recorded mark as to be likely to confuse the public.
  D. The importer may claim the personal use exemption under 19 CFR 148.55.
  E. None of the above.

The correct answer is A. The import may remove the objectionable marks from the merchandise in accordance with 19 CFR 133.22(c)(1).

You state, in pertinent part, "this question is unclear and thus it has no possible correct answer. The question states that 'the suspect mark is not identical with or substantially indistinguishable from the registered and recorded mark' while also stating 'it copies or simulates the registered and recorded mark.' These two statements can be interpreted as contradicting each other. A 'copy' could imply identicalness."

The question tests the ability to differentiate between goods bearing counterfeit trademarks, as defined by 19 C.F.R. § 133.21, and goods bearing copying or simulating trademarks, as defined by 19 C.F.R. § 133.22. The ability of the test taker to identify the proper remedy, removing or obliterating the suspect marks, is predicated on the ability to differentiate between the differing definitions in 19 C.F.R. § 133.21 and 19 C.F.R. § 133.22. Inasmuch as the words "copy," "copies," or "simulates," do not appear in 19C.F.R. § 133.21, the test taker should have been able to determine that the merchandise in the question properly fell under 19 C.F.R. § 133.22, and identify the correct answer. Accordingly, the test question does have a correct answer and the assertion that the question was unclear with possible correct answer is faulty.

7

**Question 59**
A principal is permitted to file drawback claims under the exporter's summary procedure and the principal's claims are paid prior to final determination. The bond for that principle (sic) must include an agreement that contains all of the following conditions except:

A. The principal correctly described the exported articles in the claim.
B. The principal agrees to provide proof of export upon request.
C. The principal agrees to pay any charges due CBP as provided by law or regulation.
D. Correctly stated the facts of exportation in the claim; the principal and surety, jointly and severally agree to refund, on demand, any money claimed by CBP to have been erroneously paid as a result of an incorrect statement on the drawback claim.
E. The Principal is entitled to the drawback claimed.

In grading the exam, CBP designated the correct answer as B. The question asks which of the answer choices does not have to be included as a condition in the bond agreement where a principal is permitted to file drawback claims under the exporter's summary procedure and the principal's claims are paid prior to final determination. Section 1 J 3.65(a) of title 19 Code of Federal Regulations provides the bond conditions for repayment of erroneous drawback payment under exporter's summary procedure:

> If the principal is permitted to file drawback claims under the exporter's summary procedure and the principal's drawback claims are paid before a final determination that the principal:
> - Is entitled to the drawback claimed.
> - Correctly described the exported articles in the claim.
> - Correctly stated the facts of exportation in the claim; the principal and surety, jointly and severally agree to refund, on demand, any money claimed by CBP to have been erroneously paid as a result of an incorrect statement on the drawback claim, and
> - The principal agrees to pay any charges due CBP as provided by law or regulation.
> 19 C.F.R. § 113.65(a).

Answer B, "the principal agrees to provide proof of export upon request," is not listed among the aforementioned conditions. Therefore, it is the correct answer.

You state that the question has no possible correct answer. We disagree. Answer B is correct, because the question seeks the one condition that does not have to be in the agreement. 19 C.F.R. § 113.65 provides what must be in the agreement, and answer B is not listed among the aforementioned conditions. You further contend that "when a principal is filing drawback claims, the proof of export is essential when asking for the government (CBP) to refund the duty fees as the duty fees are paid to import and export goods to and from the U.S. Without proof of the export, there cannot be a refund of the drawback duty." However, your argument is not relevant to the question asked: the question seeks the one condition that does not have to be

8

in the agreement. Per 19 C.F.R. § 113.64(a), "the principal agrees to provide proof of export upon request," is not a necessary condition that must be in the agreement. You then contend that "CBP has the authority to request any documentation or proof of any information as part of the bond agreement." Again, this assertion is irrelevant to the question at hand which focuses on the condition that does not have to be in the agreement.

Finally, you maintain that "'Upon request' is the key point here- even if the agreement doesn't request proof of export, it must be included upon request of CBP in order to comply with the CBP regulation." Your argument assumes an answer to a question that is not being asked. The question pertains to what must be in a bond agreement where the principal is permitted to file drawback claims under the exporter's summary procedure and the principal's claims are paid prior to final determination. Section 1 13.65(a) covers that exact scenario and provides what conditions must be in the agreement. Answer choice B is the only condition that is not listed in Section 1 13.65(a). Thus, the question has a correct answer and that answer is B.

**Inbox**

Found in Gmail Inbox

**BROKERMANAGEMENT**   12/7/21
To: Shuzhen & 1 more...

# RE: Please help

Good afternoon Mr. Zhong,

We have done another review with the letter you have provided, and you are correct the letter was sent to the incorrect address. We are working with our branch chief now to plan for our next steps. We will reach out to you with more information as soon as possible.

Thank you,

Hannah Arnold
International Trade Specialist
U.S. Customs and Border Protection (CBP)



1300 Pennsylvania Avenue NW
Washington, DC 20229

**U.S. Customs and Border Protection**

*No such address* (handwritten)

Shuzhen Zhong
63 Quentin Rd., 1st Floor
Brooklyn, NY 11223

MAY 2 3 2019

Dear Mr. Zhong:

Your second appeal request for review of questions 2, 31, 32, 51, 56 and 59 on the April 2018 Customs Broker License Examination has been received. Your arguments for questions 2, 31, 32, 51, 56 and 59 have been reviewed, and you received credit for question 2. Based on this determination, your final score is 73.75 percent. A score of 75 percent must be attained to achieve a passing score on the examination. The analyses for questions 31, 32, 51, 56 and 59 are enclosed.

If you have any questions regarding these results, please do not hesitate to email: brokermanagement@cbp.dhs.gov with "Second Appeal" in the subject line.

Sincerely,

Brenda B. Smith
Executive Assistant Commissioner
Office of Trade

Enclosure

1

RECEIVED & FILED

2022 FEB – 10 A 10:04

U.S. COURT OF
INTERNATIONAL TRADE
OFFICE OF THE CLERK